**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CARRINGTON ALAN KEYS,

     Plaintiff,

        v.

DISTRICT ATTORNEY JACQUELINE M.
CARROLL, et al.

     Defendants.

CIVIL ACTION NO. 3:10-CV-1570

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are Defendants' Motion for Summary Judgment (Doc. 188), Plaintiff's Motion to Stay Defendants' Motion for Summary Judgment (Doc. 192), and Plaintiff's Motion for Partial Summary Judgment (Doc. 194). Plaintiff Carrington Keys claims his rights under the First, Fourth, Eighth, and Fourteenth Amendments were violated when staff at the State Correctional Institution at Dallas ("SCI-Dallas") assaulted him, threatened him, and interfered with his legal mail in retaliation for filing grievances and complaints concerning prisoner abuse. Because Keys failed to timely file his motion for partial summary judgment, it will be struck as untimely. As Keys has not shown how the information sought from Defendants would preclude summary judgment, his motion to stay summary judgment will be denied. Because Keys fails to allege the personal involvement of numerous defendants and failed to exhaust his administrative remedies concerning an alleged assault, threat, and interference with his legal mail, Defendants' motion for summary judgment will be granted as to those defendants and claims. Because Keys exhausted his administrative remedies as to another alleged assault, Defendants' motion for summary judgment will be

denied as to those claims.

## **BACKGROUND**

Plaintiff Carrington Keys is a prisoner at SCI-Camp Hill.  The allegations giving rise to his complaint concern actions occurring in 2009 and 2010 at SCI-Dallas, where Keys was incarcerated from November 21, 2007 until April 29, 2010.  (Keys Dep. at 8-9, Dec. 7, 2011, Doc. 191.)   During all relevant times, Keys was housed in the Restricted Housing Unit ("RHU") at SCI-Dallas.  (*Id.* at 9.)  Defendants include: Jeffrey A. Beard, former Secretary of the Pennsylvania Department of Corrections ("Department"); Michael Klopotoski, the Regional Deputy Secretary for the Department; SCI-Dallas Superintendent Jerome Walsh; SCI-Dallas Deputy Superintendent Vincent Mooney; Major of the Guard Joseph Zakarauskas; former SCI-Dallas Mailroom Supervisor Nancy Fedor; and Corrections Officers ("COs") Robert McCoy, Lawrence Pudlosky, Elmore, and Angelovic.[1]  Except for Beard, all other Defendants are past and present Department employees at SCI-Dallas.  (Defs.' Statement of Undisputed Facts at 2, Doc. 190.)

Keys states that on June 28, 2009 and July 13, 2009, he lodged criminal complaints with the Luzerne County District Attorney's Office that were not investigated.  (Pl.'s Aff. in Opp'n at 1, Doc. 207).   Keys asserts that he submitted information to District Attorney Jacqueline M. Carroll alleging several Defendants' involvement in an inmate's suicide, but she forwarded his complaint to prison officials instead of investigating or prosecuting the matter.  (*Id.*)   He also alleges that the prison officials later retaliated against him by assaulting him, harassing him, and interfering with his mail.

---

[1] COs Elmore and Angelovic are listed in the caption as "Elmore Angelope" and a thorough search of the record has not  search of the record has not unearthed their first names.

Keys claims that the first instance of retaliation against him occurred on August 27, 2009, when Corrections Officers ("CO") Pudlosky and McCoy used racial slurs and insulted him for filing complaints against their superior officers. (Pl.'s Aff. in Opp'n at 2; Pl.'s Am. Compl. at 2-3, Doc. 125.) Keys asserts that COs Pudlosky and McCoy then subjected him to a retaliatory strip search where they used excessive force and assaulted him while he was handcuffed, causing him injury. (Keys Dep. at 10, 17, 25; Pl.'s Aff. in Opp'n at 2; Pl.'s Am. Compl. at 3.) He claims that COs Pudlosky and McCoy issued him falsified misconduct reports charging him with assault in order to conceal their abuse of him. (Keys Dep. at 21, 24-25.) Keys states that he filed a grievance against COs Pudlosky and McCoy for assaulting him within a week of the incident, but CO McCoy ripped up the grievance in front of him soon thereafter. (Keys Dep. at 35-36, 38; Pl.'s Aff. in Opp'n at 3.) Keys also states that COs Pudlosky and McCoy bragged to the inmates about assaulting him and threatened similar treatment for other inmates participating in the Human Rights Commission (HRC) investigation at SCI-Dallas. (Keys Dep. at 20; Pl.'s Aff. in Opp'n at 2.)

Keys claims that the next two instances of retaliation against him both occurred on October 14, 2009. First, while Keys was returning from the exercise yard that day, CO Angelovic threatened Keys for filing complaints with the HRC. (Keys Dep. at 50-51; Pl.'s Am. Compl. at 3.) CO Angelovic told Keys that he should mind his business and that his involvement in the HRC investigation at SCI-Dallas would make him a target. (*Id.*) Second, Keys asserts that while he was exiting the shower later that day, CO Elmore handcuffed and assaulted him while threatening future abuse if he did not cease his involvement with the HRC investigation. (Keys Dep. at 28-30, 34; Pl.'s Aff. in Opp'n at 4.) Keys states that although he filed a grievance concerning the alleged assault by CO Elmore and a grievance

3

about CO Angelovic's statement, he never received a response to either grievance.  (Keys Dep. at 34-35, 52-53.)  Keys does not have a copy of the grievance against Angelovic.  (*Id.* at 52-53.)

In addition to his allegations of abuse by COs, Keys claims that the staff at SCI-Dallas interfered with his mail, causing two legal matters of his to be dismissed.  (Keys Dep. at 40-50; Pl.'s Aff. in Opp'n at 3.)  The first alleged instance of interference with mail concerns a petition for writ of habeas corpus that Keys filed in the Commonwealth Court of Pennsylvania on March 17, 2010.  (Keys Dep. at 40-42; Dep. Ex. 3.)  The Commonwealth Court docket shows that the court's filing office sent Keys a defect correction notice on April 6, 2010, and that the matter was dismissed on April 29, 2010.  (Dep. Ex. 3)  Keys claimed that he never received the notice due to the interference of Mailroom Supervisor Fedor and Major Zakarauskas.  (Keys Dep. at 40, 43-44.)  Although Keys later sought and received reconsideration of the dismissal on May 14, 2010, the Commonwealth Court dismissed his case on June 15, 2010 because he failed to timely pay the filing fee or apply for *in forma pauperis* status after the May 14, 2010 order.  (*Id.* at 42-43; Dep. Ex. 3.)  Keys states that he never received the May 14, 2010 order.  (Keys Dep. at 42-43.)

Keys claims that Fedor interfered with his receipt of legal mail because she had a past practice of forwarding inmate mail to the Security Office.  (Keys Dep. at 44-45.)  Keys claims that Zakarauskas interfered with his receipt of the defect correction notice because RHU inmates, Keys included, had experienced problems with their legal mail being sent to the Security Office and being opened.  (*Id.* at 45-47.)  Keys states that he filed a grievance against Fedor and Zakarauskas for withholding his legal mail but never received a response, despite writing to SCI-Dallas' Grievance Coordinator about its status.  (Pl.'s Aff. at 4.)

4

The second alleged instance of interference with Keys' mail concerns a Post Conviction Relief Act ("PCRA") petition that he filed in the Allegheny County Court of Common Pleas on February 25, 2008. (Keys Dep. at 47-50; Criminal Docket at 13-14, Doc. 191.)  The court issued a notice of intent to dismiss Keys' *pro se* PCRA petition on May 2, 2008, and later denied his petition on June 9, 2008.  (Criminal Docket at 13-14.)  Keys claims that his PCRA action was dismissed because a box of his legal materials was shipped to SCI-Coal Township instead of SCI-Mahanoy, where he was being transferred due to an emergency.  (Keys Dep. at 47-50; Pl.'s Aff. in Opp'n at 3.)  Keys states that when his materials were returned to him, several affidavits central to his PCRA action were missing. (Keys Dep. at 49-50; Pl.'s Aff. in Opp'n at 3.)  Keys asserts that Superintendent Walsh, Deputy Superintendent Mooney, and Major Zakarauskas intentionally sent this box to SCI-Coal Township in retaliation for the complaints that Keys filed.  (Pl.'s Aff at 3.)  He further asserts that he filed a grievance about the mishandling of his legal materials but never received a response, despite writing to SCI-Dallas' Grievance Coordinator about the matter. (Keys Dep. at 54; Pl.'s Aff. at 4.)

Leilani Sears, a Grievance Review Officer in the Department of Corrections, Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), reviewed the Office's records and the grievance tracking system for all grievance appeals filed by Keys from January 1, 2009 through June 30, 2010.  (Sears Dec. at 1, Doc. 191.)  She states the following.  During that time period, Keys attempted to appeal fifteen (15) grievances to final review.  (*Id.* at 2.)  Eight (8) of those fifteen (15) appeals were dismissed as untimely or for other reasons, such as failing to properly complete the grievance appeal process, and Keys lost all seven (7) of his appeals that successfully reached final review.  (*Id.* at 2-3.)  Of the

seven (7) appeals that reached final review, only two (2) involved issues similar to those in this case. (*Id.* at 3.)  Grievance Number 277626, dated June 17, 2009, concerned Keys' attempt to ship two boxes of unidentified legal and religious material out of SCI-Dallas. (Sears Dec., Ex. A.)  Keys claimed that his boxes were being held in an attempt to harass him, but his appeal was denied because his inmate account did not have sufficient funds to cover the shipping costs.  (*Id.*)  Grievance Number 306030, dated February 3, 2010, concerned outgoing legal mail being sent to United States District Court and Bankruptcy Court and to a Ms. Dye.  (Sears Dec., Ex. B.)   Keys claimed that his outgoing mail was not sent on January 24, 2010 due to staff stealing or purposely destroying it, but his appeal was denied because his envelope to United States District Court and Bankruptcy Court was in fact sent on that date.  (*Id.*)

Finally, Keys alleges that Defendants Beard, Klopotoski, Walsh, Mooney, and Zakarauskas ("the Supervisory Defendants") "knew or were deliberately indifferent to knowing that unconstitutional policies, practices and customs were in place."  (Pl.'s Am. Compl. at 7.)  Specifically, Keys claims that the Supervisory Defendants had the policy or custom of permitting COs at SCI-Dallas to discriminate against and abuse prisoners who filed grievances or complaints.  (*Id.*)  He also alleges that the Supervisory Defendants were deliberately indifferent in failing to train SCI-Dallas personnel in lawful constitutional policies and procedures for treating inmates who file grievances and failing to provide proper surveillance at the prison.  (*Id.* at 6.)

Keys filed his initial Complaint in the Luzerne County Court of Common Pleas pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, assault, mail tampering, retaliation, and

failure to prosecute.  The Defendants removed the action to federal court.  (Doc. 1.)  In his

Amended Complaint (Doc. 125), Keys alleges Defendants' actions violated his rights: (1) to

be secure in his person and property under the Fourth, Eighth, and Fourteenth Amendments;

(2) to petition for redress of grievances under the First Amendment; (3) to be free of cruel

and unusual punishment under the Eighth Amendment; (4) of equal protection under the

First and Fourteenth Amendments; and (5) of substantive due process under the Fourteenth

Amendment.  Keys also claims assault and battery under state law.  He seeks a permanent

injunction and monetary damages against all Defendants.

These motions are now ripe and ready for the Court's review.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

A fact is material if proof of its existence or nonexistence might affect the outcome of the suit

under the applicable substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248

(1986).

Where there is no material fact in dispute, the moving party need only establish that

it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)(2).  Where, however, there

is a disputed issue of material fact, summary judgment is appropriate only if the factual

dispute is not a genuine one. *Anderson*, 477 U.S. at 248.  An issue of material fact is

genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

Where there is a material fact in dispute, the moving party has the initial burden of

proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled

to judgment as a matter of law.  *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor.*"  Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law.  *Anderson*, 477 U.S. at 256–57.  The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial."  *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)).  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."  *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S.

8

at 249.

## DISCUSSION

### I.     Plaintiff's Motion for Partial Summary Judgment

On July 24, 2012, Plaintiff Keys filed a Motion for Partial Summary Judgment (Doc. 194) that is currently before the Court.  Defendants correctly note that Keys' motion was filed after the July 15, 2012 deadline for dispositive motions established by the Court.  (Defs.' Br. in Opp'n, at 3, Doc. 201.)   Accordingly, Defendants argue that the Court should dismiss Keys' motion as untimely filed for its failure to comply with the Court's Order.  (*Id.*) Keys' responded to Defendants' timeliness arguments by arguing that if his Motion for Partial Summary Judgment is dismissed as untimely, Defendants' Motion for Summary Judgment should also be dismissed as untimely.  (Pl.'s Reply Br. at 5-6., ECF. No. 211.)

The Court is unable to discern any reason to consider a motion filed in disregard of a clear and unambiguous deadline.  The Court notes that July 15, 2012 was a Sunday and recognizes that a weekend deadline may cause confusion and result in motions being filed on the first weekday following the deadline.  In this case, Defendants filed their Motion for Summary Judgment (Doc. 188) and supporting materials (Doc. 189–91) on the next available weekday, July 16, 2012.  However, Keys did not file his Motion for Partial Summary Judgment until July 24, 2012, more than a week after the deadline.  Moreover, Keys offered no explanation for this post-deadline filing in his reply brief even though Defendants raised the issue in their brief in opposition.  Having been provided no alternative explanation, the Court finds that the Plaintiff simply disregarded the deadline for filing dispositive motions set in the Court's June 1, 2012 Order.  For this reason, the Court will strike Plaintiff's Motion for Partial Summary Judgment as untimely.

9

## II.     Plaintiff's Motion to Stay Consideration of Defendants' Motion for Summary Judgment

On July 23, 2012, Plaintiff moved to stay Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(d).  (Doc. 192.)  If a party believes that a summary judgment motion is premature and more discovery is necessary, Rule 56(d) allows a nonmovant to file an affidavit "setting forth why the time is needed."  *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 510–11 (3d Cir. 1994).  "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of [Rule 56(d)] in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition."  *Radich v. Goode*, 886 F.2d 1391, 1394 (3d. Cir. 1989) (citation omitted).  If the nonmovant shows by affidavit that he cannot present facts essential to justify his opposition to summary judgment, the court may, *inter alia*, defer considering the summary judgment motion or allow the nonmovant time to obtain affidavits or take discovery. Fed. R. Civ. P. 56(d). "District courts usually grant properly filed [Rule 56(d)] motions as a matter of course."  *St. Surin v. V.I. Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994).

The Third Circuit has "underscored the benefits of technical compliance" with Rule 56(d) and its accompanying affidavit requirement. *St. Surin*, 21 F.3d 1313–14 (3d Cir. 1994). The Third Circuit has opined that "in all but the most exceptional cases, failure to comply with [Rule 56(d)] is fatal to a claim of insufficient discovery on appeal." *Bradley v. United States*, 299 F.3d 107. 207 (3d Cir. 2002).  Yet "failure to support a [Rule 56(d)] motion by affidavit is not automatically fatal."  *St. Surin*, 21 F.3d at 1314.  Instead,

> [i]f a [Rule 56(d)] motion does not meet the affidavit requirement, it must still identify with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.  Essentially, a party moving for postponement under [Rule 56(d)]

must inform the district court why delay is needed before the motion can be properly considered.

*Id.* (internal citations and quotation marks omitted); *see also San Filippo v. Bongiovanni*, 30 F.3d 424, 432 (3d. Cir. 1994).   In this way, delay may be warranted where discovery requests are outstanding and relevant facts are under the control of the party moving for summary judgment. *San Filippo*, 30 F.3d at 432–33.

Although Keys has not attached an affidavit to his Rule 56(d) motion, he has identified the specific information that he seeks from Defendants.  He claims that Defendants have failed to produce various discovery documents that have been ordered by the Court,[2] namely: the SCI–Dallas RHU incident log from 2009 through 2010; the SCI–Dallas RHU legal logbooks from January 2009 to April 29, 2010; and various grievances or abuse complaints.  (Pl.'s Br. in Supp. of Mot. to Stay Summ. J. at 1, Doc. 193.)  Furthermore, he has also specifically identified why the information has not previously been obtained, alleging that Defendants' failure to produce the grievance records is intentional.  (*Id.*)  However, Keys does not identify how the specific information he seeks would preclude summary judgment. He simply states that he could not possibly respond to Defendants' Motion for Summary Judgment without the requested information.  Thus, Keys has not shown that he cannot present facts essential to justify his opposition to summary judgment.

Additionally, Defendants contend that they have fully complied with all of Keys'

---

[2]On February 22, 2012, this Court granted Keys' discovery requests for, *inter alia*, all grievances pertaining to Keys filed against the Defendants and the corresponding responses from 2008 through 2010; all abuse reports, letters, and complaints pertaining to Keys filed against the Defendants from 2007 to 2010; the SCI–Dallas RHU incident log for 2009 and 2010; and the KA and KB legal logbooks pertaining to Keys from January 2009 until his release from SCI–Dallas' RHU.  (Mem. at 5-6, Doc. 165.)  On April 10, this Court granted in part Keys' Motion to Alter or Amend the Court's February 22, 2012 Order, allowing him to discover grievances or abuse reports made against the Defendants to the extent they specifically allege physical retaliation against prisoners who use the grievance system or petition the government to redress grievances. (Mem. at 6-8, Doc. 173.)

discovery requests and all discovery-related court orders. (Defs.' Br. in Opp'n at 3–4, Doc. 199.)  Defendants detail how they have allowed Keys to review the K-block Legal Logbooks from January 2009 through June 2010; informed him that the requested RHU "incident logs" do not exist; and given him the Involved Staff Reports reflecting inmate grievances for "Problems with Staff," "Allegation of Abuse," and "Harassment" for Defendants. (*Id.* at 4–5.) Keys has had ample time to review this discovery and has not replied to Defendants' claims that they have fully complied with this Court's discovery orders.  Therefore, this Court has no reason to believe that Defendants have not fully complied with Keys' discovery requests and this Court's discovery-related court orders.

Because Keys has failed to show that he cannot present facts essential to justify his opposition to summary judgment, his Motion to Stay Defendants' Motion for Summary Judgment will be denied.

## III.    Defendants' Motion for Summary Judgment

### A. Exhaustion of Administrative Remedies

Pursuant to the Prison Litigation Reform Act ("PLRA"), before a prisoner may bring a civil rights action pursuant to 42 U.S.C. § 1983, or any other federal law, he must exhaust all available administrative remedies. *See* 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.  "[T]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 212 (2007).  A prisoner, however, need not exhaust every administrative remedy, only those which are available to him.  *Camp v.*

*Brennan*, 219 F.3d 279, 281 (3d Cir. 2000); *accord Brown v. Croak*, 312 F.3d 109, 112–113 (3d Cir. 2002).  "A grievance procedure is not available even if one exists on paper if the defendant prison officials somehow prevent a prisoner from using it." *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003).  A prisoner is not required to allege in his complaint that administrative remedies have been exhausted.  *Ray v. Kertes*, 285 F.3d 287 (3d Cir. 2002).  Failure to exhaust available remedies is an affirmative defense.  *Id.*  As such, it must be pleaded and proven by Defendants.  *Brown*, 312 F.3d at 111.

Whether a prisoner has exhausted his administrative remedies is a question of law to be determined by the court.  *Womack v. Smith*, 1:06-CV-2348, 2011 WL 819558 (M.D. Pa. Mar. 2, 2011) (citing *Drippe v. Tobelinski,* 604 F.3d 778, 781–82 (3d Cir.2010)). Factual disputes as to whether a prisoner has exhausted his remedies do not convert the exhaustion question into a jury matter; the court must resolve any factual disputes and determine whether exhaustion requirements have been satisfied.  *Id.* (citing *Drippe*, 604 F.3d at 781–82).  The court must consider: (1) whether the prisoner has exhausted his or her administrative remedies "in the literal sense," in other words, "whether further avenues of relief are available to him [or her] within the prison's inmate grievance process," and (2) whether the prisoner has procedurally defaulted his or her claims. *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004).  "Compliance with prison grievance procedures therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones v. Bock*, 549 U.S. 199, 218 (2007).

The administrative procedure that state inmates must use to prosecute grievances is laid out in the Department's Administrative Directive 804 ("DC-ADM 804").  This grievance system consists of three stages.  At the initial review stage, the inmate must

13

submit a grievance to the Facility Grievance Coordinator within fifteen (15) working days of the event on which the grievance is based.  An inmate who is dissatisfied with the initial decision may appeal to the Facility Manager within ten (10) working days from the date of the initial review decision.  At a state correctional institution, the Superintendent is the Facility Manager.  If an inmate is dissatisfied with the Facility Manager's decision concerning his appeal, he may then appeal to final review with SOIGA by filing an appeal within fifteen (15) working days of the date of the Facility Manager's decision.  *Powe v. Shovlin*, 3:10-CV-2534, 2011 WL 398403 (M.D. Pa. Feb. 2, 2011).  Failure to comply with the procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim.  *Spruill v. Gillis*, 372 F.3d 218, 227-32 (3d Cir. 2004).  A procedural default, "either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim." *Gallego v. United States*, No. 02-1157, 2005 WL 1653166, at *2 (M.D. Pa. July 8, 2005).

### 1. Plaintiff's Grievance Against COs Pudlosky and McCoy

Keys asserts that he filed a grievance against COs Pudlosky and McCoy soon after they allegedly assaulted him on August 27, 2009.  (Keys Dep. at 36.)  He states that within a week of filing the grievance, CO McCoy ripped it up in front of him.  (*Id.* at 36, 38.)  Defendants claim that there is no record of Keys appealing a grievance about an alleged assault by COs Pudlosky and McCoy to final review.  (Defs.' Statement of Material Facts at 7-8, Doc. 190.)

For purposes of the PLRA, a prisoner only needs to exhaust those administrative remedies available to him.  *Camp*, 219 F.3d at 281.  "When prison officials thwart an inmate's attempt to utilize his administrative remedies, those remedies are unavailable to

the inmate for purposes of exhaustion." *Candido v. Hogsten*, 315 F. App'x 405, 407 (3d Cir. 2009).  Viewing the evidence in the light most favorable to the non-movant, Keys has exhausted his administrative remedies concerning the August 27, 2009 incident because his grievance was destroyed in front of him, rendering that remedy unavailable to him. Accordingly, summary judgment will be denied as to COs Pudlosky and McCoy.

### 2. Plaintiff's Grievances Against CO Angelovic, CO Elmore, Mailroom Supervisor Fedor, and Major Zakarauskas

Keys states that he also filed grievances against the following Defendants: CO Angelovic for threatening him for his involvement with the HRC investigation at SCI-Dallas (Keys Dep. at 52); CO Elmore for assaulting him in the showers on October 14, 2009 (Keys Dep. at 34-35); and Mailroom Supervisor Fedor and Major Zakarauskas for withholding his legal mail from the Commonwealth Court (Pl.'s Aff. at 4).  He also asserts that he filed a grievance about the handling of his box of legal materials and his missing affidavits, but fails to specify against whom this grievance was filed.  (*Id.*)  Keys states that despite filing these grievances, none of them were responded to, (Keys Dep. 34-35, 52; Pl.'s Aff. at 4), even though he wrote SCI-Dallas' Grievance Coordinator to inquire into the status of several grievances.  (Pl.'s Aff. at 4.)

Defendants raise the affirmative defense that Keys has failed to exhaust his administrative remedies with regard to these grievances and have provided evidence in support of this argument.  They have presented the affidavit of Grievance Review Officer Sears, who states that her review of the grievance tracking system and other Department records shows that between January 1, 2009 and June 30, 2010, Keys only successfully appealed seven (7) grievances to final review.  (Sears Dec. at 2.)  None of the seven (7)

appeals involved an incident that Keys has described in this case.  (*Id.*)  Defendants have also produced relevant documentary evidence of these appeals.

In an attempt to rebut Defendants' affirmative defense, Keys relies on his complaint, deposition testimony, and affidavit.  These sources have not produced any evidence showing that Keys appealed the complained-of grievances against Defendants to final review or even filed them at all.  As "[a]llegations made without evidentiary support may be disregarded," *James v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000), and  "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), Keys has failed to rebut Defendants' defense.  Because Defendants have shown that Keys failed to exhaust his administrative remedies concerning his grievances against Angelovic, Elmore, Fedor, and Zakarauskas, summary judgment will be granted for Angelovic, Elmore, and Fedor.

### B. Supervisory Defendants' Personal Involvement

To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law.  *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000); *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993).

Liability in a § 1983 action "cannot be predicated solely on the operation of *respondeat superior*."  *Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir.2005) (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1998)). To establish liability for deprivation of a constitutional right under § 1983, a party must show personal involvement by each defendant.  *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009); *Santiago v. Warminster Twp.*,

629 F.3d 121, 130 (3d Cir. 2010).  "It is uncontested that a government official is liable only for his or her own conduct and accordingly must have had some sort of personal involvement in the alleged unconstitutional conduct."  *Argueta v. U.S.I.C.E.*, 643 F.3d 60, 71-72 (3d Cir. 2011).  Personal involvement in the alleged wrongs may be shown through allegations of actual involvement in, personal direction of, or knowledge of and acquiescence to the asserted civil rights violations.  *Rode*, 845 F.2d at 1207 (citations omitted).  "In order to satisfy the 'personal involvement' requirement, a complaint need only allege the conduct, time, place, and person responsible."  *Solan v. Ranck*, 326 F. App'x 97, 101 (3d Cir. 2009) (per curiam) (quoting *Evancho*, 423 F.3d at 354). Nevertheless, individual liability can only be imposed if the state actor played an "affirmative part" in the complained-of misconduct.  *See Rode*, 845 F.2d at 1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement.  *See id.*  Instead, "allegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity."  *Rode*, 845 F.2d at 1207.

Keys believes that the Supervisory Defendants had actual knowledge of and acquiesced to policies of retaliation against and abuse of prisoners at SCI-Dallas.  He alleges that these defendants held supervisory positions at all relevant times and "knew or were deliberately indifferent to knowing that unconstitutional policies, practices, and customs were in place" that condoned guards retaliating against and abusing prisoners who filed grievances.  (Am. Compl. at 7.)   The Supervisory Defendants contend that they are entitled to summary judgment because they had no personal involvement in the

17

incidents alleged in the complaint.  (Defs.' Br. in Supp. at 9-10, Doc. 189.)  They argue

that they were not present at the time of the alleged assaults and had no prior knowledge

that any such behavior would occur.  (*Id.*)

### 1. Former Secretary Beard

In his deposition testimony, Keys generally asserts that former Secretary Beard

was aware of the "unconstitutional policies and practices that were taking place at SCI-

Dallas" and "of the complaints and stuff that was going on with the Human Rights

Coalition. . . ."  (Keys Dep. at 55.)  Keys also proffers the affidavit of a fellow inmate,

Isaac Sanchez, who states that he spoke to Beard and other defendants "about the

conditions, mistreatment, assaults and general atmosphere of retaliation" in the RHU at

SCI-Dallas at some point during 2009 or 2010.  (Sanchez Aff., Ex. E, Doc. 198.)

Keys' attempt to establish liability against Beard appears to be based solely on his

supervisory capacity as the head of the Department.  Keys' allegations of Beard's

personal involvement are broad and conclusory rather than factual and particular.  Keys

simply states that Beard was the Secretary of the Department at all relevant times and

"knew or [was] deliberately indifferent to knowing that unconstitutional policies, practices

and customs were in place."  (Am. Compl. at 7.)  Keys avers that Beard had a reason to

believe that procedures were not being followed at SCI-Dallas because inmate

complaints and HRC reports named the same COs.  (Keys Dep. at 55-56.)  However,

Keys does not state Beard's actual knowledge and acquiescence with any particularity.

Although Sanchez avers that he spoke to Beard about retaliation against an RHU inmate,

he cannot pinpoint when or where this conversation took place.  Because Keys has failed

to demonstrate Beard's personal involvement in the deprivation of his constitutional rights

18

with particularity, summary judgment will be granted in Beard's favor.

### 2. Superintendent Walsh

Keys asserts that Walsh "was . . . in a [supervisory] position at that time" and "had knowledge of the widespread abuse at SCI-Dallas RHU."  (Keys Dep. at 57.)  In his affidavit, Sanchez says that he spoke with Walsh "about the conditions, mistreatment, assaults and general atmosphere of retaliation" in SCI-Dallas' RHU at some point during 2009 or 2010.  (Sanchez Aff., Ex. E, Doc. 198.)  Andre Williams, another inmate at SCI-Dallas, says that he witnessed RHU inmates speak with Walsh about abuse and harassment on several occasions.  (Williams Aff., Ex. J, Doc. 198.)

Keys' attempt to establish liability against Walsh based solely upon his supervisory capacity is insufficient for purposes of alleging his personal involvement in constitutional misconduct.  Keys states that Walsh was a supervisor at SCI-Dallas at all relevant times and, without more, concludes that he knew of or was deliberately indifferent to knowing of the unconstitutional policies, practices, and customs of retaliation at the prison.  (Am. Compl. at 7.)  The affidavits of Sanchez and Williams are also generalized.  Because Keys has failed to demonstrate Walsh's personal involvement with any particularity, summary judgment will be granted in Walsh's favor.

### 3. Major Zakarauskas

Keys states that he sued Zakarauskas because "whenever [an] abuse allegation is made and a report is made, it has to go through him. . . . [H]e has to review that report." (Keys Dep. at 58.)  He simply states that Zakarauskas was a supervisor at SCI-Dallas at all relevant times and then concludes that he knew of or was deliberately indifferent to

knowing of unconstitutional policies, practices, and customs at the prison.  (Am. Compl. at 7; Keys Dep. at 58.)  Neither Sanchez nor Williams state that they spoke with or saw a fellow inmate speak with Zakarauskas about retaliation or abuse at SCI-Dallas.  Keys' attempt to establish liability against Zakarauskas solely on the basis of his supervisory capacity is insufficient for purposes of alleging his personal involvement in constitutional misconduct.  Therefore, summary judgment will be granted in Zakarauskas' favor.

### 4. Deputy Superintendent Mooney

Keys alleges that Mooney was a supervisor at SCI-Dallas at all relevant times and knew of or was deliberately indifferent to knowing of unconstitutional policies, practices, and customs at the prison.  (Am. Compl. at 7.)  Keys states that Mooney was sued because, like all other supervisory officials at SCI-Dallas, he "had knowledge of unconstitutional practices."  (Keys Dep. at 57.)  He further asserts that he and his fellow inmates spoke with Mooney during his weekly rounds of the RHU, but their complaints would be ignored.  (*Id.*)  Sanchez's affidavit references speaking with Mooney about assaults and retaliation occurring in SCI-Dallas' RHU at some point during 2009 or 2010.  (Sanchez Aff., Ex. E.)  Williams states that on several occasions, he witnessed RHU inmates speak with Mooney about inmate abuse and harassment.  (Williams Aff., Ex. J.)

Again, Keys' allegations and statements regarding Mooney's personal involvement are broad, vague, and conclusory rather than factual and particular.  Keys' deposition testimony does not reference with any specificity what, if anything, he discussed with Mooney.  (Keys Dep. at 57.)  The affidavits of Sanchez and Williams also lack the requisite particularity.  (Sanchez Aff., Ex. E.; Williams Aff., Ex. J.)  These amount to a hypothesis that Mooney had personal knowledge of the alleged deprivation of Keys'

constitutional rights.  Because Keys' allegations of Mooney's personal involvement lack

particularity, summary judgment will be granted in Mooney's favor.

### 5. Former Superintendent Klopotoski

Keys alleges that Klopotoski was a supervisor at SCI-Dallas at all relevant times

and knew or was deliberately indifferent to knowing of the unconstitutional policies,

practices, and customs at the prison.  (Am. Compl. at 7.) Keys states that he sued

Klopotoski because "he was during the superintendent during some of the time of the

incidents, and he . . . also had knowledge of it."  (Keys Dep. at 57.)  Keys further states

that inmates would talk to Klopotoski "about the problems that [were] occurring with the

guards" when he made his rounds of the prison, but their complaints were not acted

upon.  (*Id.*)  Sanchez says that at some point during 2009 or 2010, he spoke with

Klopotoski about inmates being assaulted, mistreated, and retaliated against by RHU

guards.  (Sanchez Aff., Ex. E.)  Williams further states that he saw several inmates speak

with Klopotoski about prison staff abusing and harassing RHU inmates at SCI-Dallas.

(Williams Aff., Ex. J.)

Keys fails to show Klopotoski's personal involvement with particularity.  Once

more, Keys attempts to establish liability on the basis of a supervisor's capacity at SCI-

Dallas, which is insufficient for purposes of alleging personal involvement in constitutional

misconduct.  Keys' allegations and the statements of Keys, Sanchez, and Williams are

general and vague and lack the factual particularity necessary to allege actual knowledge

of and acquiescence to allegedly unconstitutional policies at SCI-Dallas.  Because Keys

has failed to allege Klopotoski's personal involvement with particularity, summary

judgment will be granted in favor of Klopotoski.

## CONCLUSION

Because Plaintiff Carrington Keys failed to timely file his Motion for Partial Summary Judgment, it is struck as untimely.  As Keys has not shown how the information sought from Defendants would preclude summary judgment, his Motion to Stay Defendants' Motion for Summary Judgment is denied.  Because Keys failed to exhaust his administrative remedies pursuant to his claims against Angelovic, Elmore, and Fedor, summary judgment is granted in those defendants' favor.  Because Keys exhausted his administrative remedies pursuant to his assault claim against Pudlosky and McCoy, summary judgment is denied as to those defendants.  Finally, because Keys failed to allege the personal involvement of the Supervisory Defendants (Beard, Walsh, Zakarauskas, Mooney, and Klopotoski) with particularity, summary judgment is granted in their favor.

An appropriate order follows.


September 26, 2012                              /s/ A. Richard Caputo
Date                                           A. Richard Caputo
                                               United States District Judge